# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES | : | CRIMINAL ACTION |
| --- | --- | --- |
| v. | : | |
| | : | |
| ALEXANDER KHODAK | : | NO. 09-187 |
| | : | |

DuBOIS, J.                                                                                              March 22, 2010

**M E M O R A N D U M**

## I. INTRODUCTION

On September 2, 2009 defendant, Alexander Khodak, pleaded guilty to conspiracy to distribute mixtures and substances containing oxycodone, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(C) & 846; and to two counts of distribution of a mixture or substance containing a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), and 18 U.S.C. § 2. A hearing to determine the quantity of the drugs involved in these offenses was held on January 29, 2010. After considering the testimony of the witnesses at that hearing, the exhibits received in evidence, and the written submissions of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

1. Alexander Khodak was the pharmacist-in-charge at Bell's Pharmacy and Somerton Pharmacy, both located in Philadelphia. (Transcript of Drug Quantity Hearing, Jan. 29, 2010, 56 - 57) ("Tr.").[1]

2. Before working at Bell's and Somerton Pharmacies, Khodak worked at Squire Pharmacy.

---

[1] The testimony at trial was that the pharmacies are titled in the name of Khodak's wife. (Tr. 7, 10, 104.) However, Khodak told investigators he was the owner of the two pharmacies but "not on paper." (Tr. 57.) The Court declines to make a finding as to ownership of the pharmacies because such a finding is irrelevant to the Court's determination of the quantity of drugs involved in Khodak's offenses.

-1-

(Tr. 61.) At Squire Pharmacy, Khodak filled prescriptions for Anthony Sapizio. (Tr. 64.) Khodak admitted to a DEA investigator that he knew the prescriptions he filled for Sapizio at Squire Pharmacy were sham prescriptions. (Tr. 65.)

3. Upon leaving Squire Pharmacy, Khodak continued to fill sham prescriptions for Sapizio at Bell's Pharmacy. (Tr. 66.)

4. Alexander Khodak was introduced to Stephen Anderson by their mutual acquaintance, Anthony Sapizio, at Bell's Pharmacy in 2004. (Tr. 25, 38, 39, 68.)

5. Stephen Anderson bought sham prescriptions from Dr. Joseph Borkson for drugs including OxyContin, Percocets, Lorcets, Xanax, Tussionex and Phenergan with Codeine, beginning in 2001. (Tr. 15, 24.)

6. Dr. Borkson's office is approximately twelve miles away from Bell's Pharmacy. (Tr. 15, 24, 78.) Most of Bell's Pharmacy's customers live nearby. (Tr. 105.)

7. During the 2004 meeting at Bell's Pharmacy, Anderson gave Khodak sham Borkson prescriptions and asked Khodak to fill them. (Tr. 25-26.)

8. Anderson did not show Khodak identification, did not appear sick, did not tell Khodak why he needed the prescriptions and was dressed casually in jeans. (Tr. 27, 28, 40.) Khodak did not offer information on how the prescriptions should be taken. (Tr. 27.)

9. Khodak examined the prescriptions and told Anderson he recognized Borkson as a doctor who did a lot of writing for prescription drugs. (Tr. 26.)

10. Khodak filled the sham Borkson prescriptions given to him at the 2004 meeting by Anderson without calling Dr. Borkson to verify the prescriptions. (Tr. 26, 43.) Anderson paid for the prescriptions with cash. (Tr. 27.)

11. Two prescriptions signed by Dr. Borkson were filled at Bell's Pharmacy on August 23, 2004. (Tr. 74); (Gov't Exs. 2, 3.) One, for Percocet, was filled in the name of "Edward Thompson";

the other, for Phenergan with Codeine, was filled in the name of "Eugene Stevenson." (Tr. 74-76); (Gov't Exs. 2, 3.) Anderson used these names, among others, when obtaining sham Borkson prescriptions. (Tr. 32-33.)

12. After having his prescriptions filled at the first, 2004, meeting, Anderson told Khodak he was "getting the paper every day" and asked if he could return to have more prescriptions filled. (Tr. 28.) Khodak responded yes. (Tr. 28.)

13. After the first meeting, Anderson came to Bell's Pharmacy almost daily to have between two and eight sham Borkson prescriptions filled, all in different names. (Tr. 28-30.) Anderson never explained why he had so many prescriptions and always paid cash. (Tr. 30.) Khodak never asked why Anderson was traveling twelve miles across town to have his prescriptions filled and never asked for identification regarding any of the prescriptions he filled for Anderson. (Tr. 30.)

14. Eventually, Khodak told Anderson to have his prescriptions filled at both Bell's Pharmacy and Somerton Pharmacy. (Tr. 31, 46-47, 59, 63.)

15. Khodak also told Anderson that Anderson could have his prescriptions filled by other employees of Bell's Pharmacy and Somerton Pharmacy when Khodak was not working. (Tr. 35-36, 45.)

16. Between August 2004 and February 2006, Anderson filled 2,583 sham prescriptions at Bell's Pharmacy and Somerton Pharmacy, paying a total of $211,699 for the drugs. (Tr. 72-74, 97); (Govt' Ex. 7).

17. Of the 2,583 sham prescriptions Anderson had filled, 331 were for oxycodone. (Tr. 29, 58-59); (Gov't Ex. 4.) These prescriptions contained a total of 177 grams of oxycodone. (Tr. 79); Gov't Ex. 8.)

18. Inessa Lerner, a part-time employee at Bell's Pharmacy from December 2004 until approximately May 2009 and an employee at Somerton Pharmacy from May 2009 to the present, was

not aware that Dr. Borkson was issuing sham prescriptions. (Tr. 102.)

19. Alexander Khodak did not tell Inessa Lerner to fill Borkson prescriptions provided by Anderson. (Tr. 102.)

### III. CONCLUSIONS OF LAW

1. Khodak aided and abetted Anderson's use of sham prescriptions to illegally obtain drugs at Bell's Pharmacy and Somerton's Pharmacy in the period from August 23, 2004 until February 2006.

2. Khodak is criminally responsible for the distribution of 177 grams of oxycodone, a Schedule II controlled substance. This is the amount of oxycodone Khodak "aided, abetted, counseled, commanded, induced, procured , or willfully caused" to be distributed and, in the case of jointly undertaken criminal activity, is the amount distributed by others in furtherance of Khodak's jointly undertaken criminal activity, which was reasonably foreseeable to Khodak.

### IV. DISCUSSION

The quantity of drugs attributable to a defendant must be supported by a preponderance of the evidence "with sufficient indicia of reliability to support its probable accuracy." United States v. Gibbs, 190 F.3d 188, 203 (3d Cir. 1999). The Third Circuit has recognized that, in calculating the amount of drugs involved in a particular conspiracy, "a degree of estimation is sometimes necessary." Id. See also United States v. Collado, 975 F.2d 985, 998 (3d Cir. 1992) ("[I]n calculating the amounts in drug transactions, some degree of estimation must be permitted, for the government usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy.")

Section 1B1.3 of the United States Sentencing Guidelines defines the relevant conduct used to determine a defendant's drug quantity level. That section of the guidelines bases the offense level on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured,

or willfully caused by the defendant" and "in the case of jointly undertaken criminal activity . . . all reasonably foreseeable acts and omission of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. §1B1.3(1)(A) & (B).

As Application Note 2 of § 1B1.3 explains, the scope of the "jointly undertaken criminal activity" is not the same as the scope of a conspiracy. "The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant under [§1B1.3]." Id. In drug cases, the Third Circuit has held that "a sentencing court may consider drug quantities outside the offense of conviction." United States v. Williams, 917 F.2d 112 (3d Cir. 1990).

### A. The Initial Date For Calculating Drug Quantity

The court concludes that the testimony of Regina Spaddy and Stephen Anderson establishes, by a preponderance of the evidence, that Khodak knew the prescriptions he was filling for Anderson were fraudulent from the time of their first meeting on August 23, 2004 to February 2006. Specifically, the evidence shows that Anderson was introduced to Khodak through the agency of Anthony Sapizio, an individual Khodak knew was illegally acquiring prescription drugs. (Findings of Fact ¶¶ 2-4) (hereinafter "Find.") During the introductory meeting at Bell's Pharmacy in August 2004, Anderson provided Khodak with sham prescriptions signed by Dr. Borkson, a doctor Khodak knew "did a lot of writing." (Find. ¶ 7, 9.) Although Anderson did not appear to be sick, Khodak filled Borkson prescriptions for Anderson in the names of Edward Thompson and Eugene Stephenson on August 23, 2004 without asking Anderson for identification, without asking Anderson why he was filling multiple prescriptions, without giving Anderson information about how to use the prescriptions and without calling Dr. Borkson to verify the prescriptions. (Find. ¶¶ 8, 10, 11.) Anderson paid for these initial prescriptions, and all subsequent prescriptions, in cash. (Find. ¶¶ 10, 13.)

Thereafter, with Khodak's express permission, Anderson went to Bell's Pharmacy approximately every day to have anywhere from two to eight prescriptions, in various names, filled by Khodak. (Find. ¶ 12, 13.) Khodak did not ask why Anderson had so many prescriptions or why he was traveling twelve miles across the city to fill them. (Find. ¶ 6, 13.) This evidence, when viewed as a whole and evaluated under the totality of the circumstances, establishes by a preponderance of the evidence that Khodak was aware the Borkson prescriptions he filled for Anderson were a sham during the period from August 23, 2003 until February 2006.

**B. Khodak's Responsibility for Prescriptions Filled by Coworkers at Both Bell's Pharmacy and Somerton Pharmacy**

The Court concludes that the testimony presented at the hearing establishes, by a preponderance of the evidence, that Khodak told Anderson to have prescriptions filled at both Bell's Pharmacy and Somerton Pharmacy. (Find. ¶ 14.) It also establishes, by a preponderance of the evidence, that Khodak told Anderson he could have prescriptions filled by Khodak or, when Khodak was not working, by one of Khodak's coworkers. (Find. ¶ 15.)

Although the Court finds the testimony of Inessa Lerner to be credible, her statement that Khodak never asked her to fill Borkson prescriptions or to fill prescriptions brought in by Anderson does not change the sentencing analysis. The issue is whether Khodak aided and abetted Anderson, not whether he aided and abetted his coworker's filling of fraudulent prescriptions.

By telling Anderson to have prescriptions filled at the pharmacies even when Khodak was not there, Khodak "aided and abetted" in the filling of those fraudulent prescriptions. See United States v. Dixon, 658 F.2d 181, 189 n. 17 (3d Cir. 1981) (noting that the elements of the crime of aiding and abetting are "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with the intent to facilitate it.").

As explained in Application Note Two to § 1B1.3, Khodak is responsible for all "reasonably foreseeable quantities of contraband that were within the scope of [jointly undertaken criminal activity.]" The "jointly undertaken activity" includes a plan or scheme undertaken by the defendant with others, whether or not it is charged as a conspiracy. U.S.S.G. § 1B1.3(a)(1)(B). By telling Anderson to have prescriptions filled even in Khodak's absence, Khodak could reasonably foresee that Anderson would have prescriptions filled by Khodak's coworkers.

The government has established, by a preponderance of the evidence, that Khodak aided and abetted Anderson by telling Anderson to have prescriptions filled at both Bell's and Somerton Pharmacy, regardless of whether Khodak was working.

### C. Drug Quantity Calculation

Khodak is responsible for all of the sham Borkson prescriptions filled by Anderson at Bell's Pharmacy and Somerton Pharmacy between August 23, 2004 and February 2006. At the hearing, Khodak's counsel stipulated that 2,583 Borkson prescriptions were filled by Anderson during this period. Of those 2,583 prescriptions, 331 were for schedule II narcotic controlled substances containing oxycodone. (Find. ¶ 17.) These 331 prescriptions contained a total of 177 grams of oxycodone (Find. ¶ 17.), and are the only prescriptions affecting the sentencing guideline level. See U.S.S.G. § 2D1.1 Application Note 10(E).

BY THE COURT

    /s/ Jan E. Dubois
    **JAN E. DUBOIS, J.**